*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) |
| | Supreme Court No. S-17210 |
| ARTHUR A. | ) ) |
| | Superior Court No. 4FA-18-00446 PR |
| | ) ) |
| | O P I N I O N |
| | ) ) |
| | No. 7427 – February 7, 2020 |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for Arthur A. Laura E. Wolff, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.

## I.    INTRODUCTION

A respondent appeals a 30-day involuntary commitment order entered after the superior court determined he was mentally ill, posed a risk of harm, and was gravely disabled. He contends the court erred by refusing to allow him to represent himself at the commitment hearing. We hold that a respondent in involuntary commitment proceedings has at least an implied statutory right to self-representation, although that

right is not absolute. If a respondent clearly and unequivocally invokes the self-representation right, the superior court must hold a preliminary hearing and consider factors we outlined in *McCracken v. State* to determine whether self-representation should be allowed.[1] Because the respondent's self-representation request in this case was denied without adherence to the *McCracken* framework, we conclude that the 30-day commitment order must be vacated.

## II. FACTS AND PROCEEDINGS

### A. Facts Leading To Involuntary Commitment

After attending Stanford University for undergraduate education, then-25-year-old Arthur A.[2] moved to Fairbanks in January 2018 to pursue additional education at University of Alaska Fairbanks (UAF). Over the next few months Arthur twice went to Fairbanks Memorial Hospital (FMH) for unspecified reasons, but he did not meet FMH's "involuntary hold criteria" either time and was not admitted.[3]

In August Arthur was taken to a local correctional facility following an "altercation" in the community. There is little admissible evidence in the record

---

[1]   518 P.2d 85 (Alaska 1974). We held in that case that the trial court should: (1) "ascertain whether a [respondent] is capable of presenting his allegations in a rational and coherent manner"; (2) ensure that the respondent "understands precisely what he is giving up by declining the assistance of counsel"; (3) explain the "advantages of legal representation" to the respondent "in some detail"; and (4) "determine that the [respondent] is willing to conduct himself with at least a modicum of courtroom decorum." *Id.* at 91-92.

[2]   We use a pseudonym to protect the respondent's privacy.

[3]   FMH's referenced "involuntary hold criteria" apparently relates to AS 47.30.710(b), providing that a mental health professional may hospitalize a person "on an emergency basis" if the person either is "mentally ill and that condition causes the [person] to be gravely disabled or to present a likelihood of serious harm to self or others" or otherwise "is in need of care or treatment."

regarding this incident other than vague references to a disturbance at a fast-food chain restaurant. Arthur apparently became "agitated and disorganized"; he was taken to FMH,[4] where a medical professional determined he met involuntary hold criteria. An FMH staff member applied for an ex parte order to involuntarily hospitalize Arthur for evaluation.[5]

FMH's staff member alleged that Arthur had been diagnosed with "schizoaffective disorder, bipolar type" and that he previously had been hospitalized in California. She stated that Arthur was mentally ill — noting that he was "manic, impulsive, and highly energetic" — and had disorganized thoughts. She further stated that Arthur was gravely disabled or likely to cause serious harm to himself or others, noting that he indicated he was president of the United States and owned multiple sports franchises, banged on windows and tapped his fists, refused to use the telephone for privacy reasons, could not choose his meals, removed his pants in front of staff, and clogged the toilet with trash. She noted that FMH staff had administered three "agitation sets" to Arthur since his arrival "to calm his irri[t]ability and mania." (Arthur's psychiatrist later testified that "agitation sets" are medications given for "acute dangerousness.") She stated that, taken together, these behaviors indicated "abnormal thinking and perception . . . caus[ing] [Arthur] to become agitated and aggressive

---

[4] Alaska Statute 47.30.705 authorizes peace officers and certain mental health professionals to detain and deliver a person to the nearest appropriate facility for evaluation on an emergency basis.

[5] Alaska Statute 47.30.700 sets out procedures for obtaining an ex parte court order for the initial involuntary hospitalization of a person alleged to be mentally ill. A mental health professional who has performed an emergency examination may hospitalize a person in an emergency under AS 47.30.710(b) and must "apply for an ex parte order authorizing hospitalization for evaluation" if an order has not yet been obtained.

(verbally)" and that he was "creating an unsafe environment for others" because he had "los[t] touch with reality."

The superior court authorized Arthur's hospitalization for evaluation, finding probable cause to believe he was both likely to cause serious harm to others, based on "abnormal thinking" making him "extremely agitated and posturing," and gravely disabled, based on his inability "to manage affairs safely."

## B.     30-Day Commitment Petition And Hearing

Two days later Arthur's FMH psychiatrist and another FMH mental health professional filed a 30-day involuntary commitment petition.[6]  The psychiatrist alleged that Arthur presented as "actively psychotic" and that Arthur believed he had invented the internet and had one trillion dollars.  The psychiatrist noted that Arthur was manic, slept poorly, and had poor physical boundaries.  She also noted that Arthur was refusing medications and becoming "increasingly agitated."  She believed that Arthur was "likely to cause harm to himself[] or others," requiring commitment for 30 days.[7]  The superior court held a hearing on the petition the following day.[8]

Arthur's attorney first informed the court that Arthur wanted to represent himself during that hearing.  The court responded:  "[B]ased on the petition, the [c]ourt would find that the responde[nt] is not fit to represent himself."  The court asked

---

[6]     Alaska Statute 47.30.730(a) allows specified mental health professionals to petition for a person's 30-day involuntary commitment and establishes procedures for the petition.

[7]     *See* AS 47.30.730(a)(1) (requiring that petition for 30-day commitment allege respondent is mentally ill and, as a result, is (1) likely to cause harm to self or others, or (2) gravely disabled).

[8]     *See* AS 47.30.715 (providing court shall set time for commitment hearing to be held "within 72 hours after the respondent's arrival" at an evaluation facility); AS 47.30.735 (establishing commitment hearing procedures).

Arthur's attorney whether further inquiry was required; the attorney responded that she did not believe so. Arthur then interrupted the court, stating that he "would like to [be] evaluated by a psychiatrist to determine [his] fitness." The court responded that "based on some testimony, [it would] explore further whether or not that [was] a reasonable possibility."

The State then called its only witness, Arthur's treating psychiatrist. She testified that she had spoken with Arthur about his desire to represent himself. She said Arthur had indicated that a law degree was unnecessary and that he understood the meaning of exculpatory and incriminating evidence.

The psychiatrist also testified more generally about Arthur's mental illness and symptoms. She stated that Arthur met the criteria for bipolar disorder. She discussed the likely cause of Arthur's current episode, noting that she had been told his medications recently had changed and that he had stopped taking them, causing him to become "destabilized." She stated that she had met with Arthur both that day and the previous day and that he was "grandiose," "pressured," "disorganized," "aggressive," and "ha[d] poor insight into his condition." She cited examples of irrational thought similar to those described in the commitment petition, including that he believed he possessed large sums of money, invented the internet, and owned AT&T.

The psychiatrist testified that Arthur had exhibited aggressive behaviors. She stated that "he made one effort to push through the nursing station door" and required security staff on multiple occasions. She stated that during his first day at FMH he had required five "agitation sets" — medications given for "acute dangerousness" — and that "he was so agitated" medications had to be forcibly administered. Although he had not required emergency medication since that day, she expected his symptoms would worsen if untreated, and "he would either find himself again in conflict with the legal

system in the community" or there would be "more dire consequences, such as harming someone or someone harming him because of his behaviors."

The psychiatrist said she would feel unsafe with Arthur in the community, "based on his symptoms, his poor insight into his symptoms, and . . . the information that he, in the community, was in fact acting dangerously." She also said she believed Arthur likely would have hurt someone at FMH but for the precautionary steps undertaken; she believed that had he behaved similarly while outside FMH, "the results would have been significantly different and more dire." And although the commitment petition was not based on grave disability,[9] the psychiatrist testified that she did not feel Arthur could survive safely in the community if untreated. She cited his "very haphazard way" of eating that required staff monitoring of his food intake and her concern about "his ability to advocate for himself appropriately."

At the end of the psychiatrist's direct testimony, the superior court stated, "with the benefit of that direct testimony," it would "deny, finally, [Arthur's] application to represent himself." On cross-examination the psychiatrist testified that she was not aware of any criminal charges pending against Arthur. She stated that although Arthur had not taken medications in over 24 hours, he still could be under their "lingering effect." She acknowledged that Arthur had not assaulted or attempted to assault anyone at FMH, that he ate when food was provided, and that she could refer him to medical services outside FMH.

Arthur then testified on his own behalf. He said he could not recall the dates or precise classes he was registered to take at UAF. But Arthur also said he lived in a UAF dormitory near fire and police stations, had access to both public transportation and ride-sharing services, already had purchased a meal plan that soon would become

---

[9]    *See* AS 47.30.915(9) (defining "gravely disabled").

active, and had winter clothing. He stated that he was on Medicaid but was unwilling to continue seeing the therapist he previously had seen. Arthur denied attempting to push through the nursing station door, and he stated that he had never wanted to hurt himself or others: "I've never even hurt a fly, I've never had any thoughts of violence."

The court asked Arthur a series of questions about events leading to the proceeding. Arthur repeatedly asserted, "I do not recall." When pressed further, Arthur appeared confused, asking about the location where police had picked him up, whether the fast-food chain had a restaurant in Fairbanks, whether his card had cleared if he was there, who had claimed he had been there, whether he had said under oath that he had been there, and why the hospital had been there.

## C. Superior Court Findings

The superior court made oral findings at the end of the hearing and granted the commitment petition. The court found that Arthur had been diagnosed with bipolar disorder and, as a result of the disorder, that he presented a danger to both himself and the community. The court stated that Arthur's being brought to FMH by police was "evidence of his agitated state" and that his behaviors "resulted in public disturbances." The court found that the five agitation sets Arthur initially had been administered were "evidence that [his] behavior [was] dangerous and likely to endanger others, and in the response of the others, danger to himself." The court stated that based on Arthur's history and the hearing testimony, "there is also reason to believe that the current mental condition is impairing [his] ability to behave safely in the community." The court issued a written order that same day, finding that Arthur was mentally ill and, as a result, both likely to cause harm to himself or others and gravely disabled.

This appeal followed.

## III. DISCUSSION: IT WAS ERROR TO DENY ARTHUR'S SELF-REPRESENTATION REQUEST WITHOUT FIRST CONDUCTING A SEPARATE INQUIRY.

Arthur argues that involuntary commitment respondents have constitutional and statutory rights to self-representation[10] and that the superior court erred by failing to conduct a proper inquiry into his competence for self-representation prior to taking evidence for the commitment petition. The State does not contest that a respondent has the right to self-representation in an involuntary commitment proceeding, instead arguing that the superior court did not abuse its discretion by determining Arthur was not fit to represent himself.[11]

### A. Implicit Statutory Right To Self-representation

Our *McCracken v. State* holding extended the right to self-representation, traditionally limited to criminal prosecutions.[12] In *McCracken* we held that a petitioner in a post-conviction relief proceeding has a constitutional right to self-representation,

---

[10] We decide de novo questions of constitutional interpretation, *In re Hospitalization of Linda M.*, 440 P.3d 168, 171 (Alaska 2019), adopting "the rule of law that is most persuasive in light of precedent, reason, and policy." *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016) (quoting *Se. Alaska Conservation Council v. State*, 202 P.3d 1162, 1167 (Alaska 2009)). "We apply our independent judgment to the interpretation of Alaska statutes and will interpret statutes 'according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters.'" *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011) (citation omitted) (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

[11] "[W]e review decisions limiting or denying self-representation for abuse of discretion." *Barry H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 404 P.3d 1231, 1235 (Alaska 2017).

[12] 518 P.2d 85, 91-92 (Alaska 1974).

although that right is not absolute.[13]  Concluding that self-representation in a post-conviction hearing is a fundamental right under the "retained rights" provision of article I, section 21 of the Alaska Constitution, we held that the right to self-representation had been "long established" and was of "fundamental importance."[14]  In reaching this determination, we looked to the value of individual autonomy and freedom of choice: "[T]he opportunity to determine whether to present one's own case or to be represented by appointed counsel is of paramount importance to the individual.  Under some circumstances, [the individual] may indeed be the only person who will forcefully advance arguments in an unpopular cause."[15]  We thus concluded that when "liberty itself is at stake," an individual's right to self-representation "should not lightly be disregarded."[16]

　　　　We have adopted *McCracken*'s self-representation analysis in another civil context.  In *Barry H. v. State, Department of Health & Social Services, Office of Children's Services*[17] we considered a parent's self-representation right in a Child in Need of Aid (CINA) case.  But rather than looking to constitutional origins of the right

---

[13]　　*Id.* at 88-92.

[14]　　*Id.* at 91 ("[T]he enumeration of rights in this constitution shall not impair or deny others retained by the people." (quoting Alaska Const. art. 1 § 21)).

[15]　　*Id.*

[16]　　*Id.*  One year after *McCracken* the United States Supreme Court held in *Faretta v. California*, 422 U.S. 806, 818-21 (1975), that the Sixth Amendment to the United States Constitution grants criminal defendants, through implication, a constitutional right to self-representation.

[17]　　404 P.3d 1231 (Alaska 2017).

to self-representation, as we did in *McCracken*,[18] we looked to the Alaska CINA Rules themselves: Rule 12(c) provides that a trial court "shall accept a valid waiver of the right to counsel by any party if the court determines that the party understands the benefits of counsel and knowingly waives those benefits."[19] We held that the CINA Rules incorporate the *McCracken* standard into CINA proceedings.[20]

We have not yet directly addressed whether the right to self-representation extends to involuntary commitment proceedings. But a respondent's right to self-representation is implicit in the statutory framework. Alaska Statute 47.30.725, enumerating a respondent's rights once detained for an involuntary commitment hearing, recognizes a respondent's right to an attorney.[21] Subsection (d) specifically provides: "The respondent has the right to be represented by an attorney, to present evidence, and to cross-examine witnesses who testify against the respondent at the hearing." The enumerated rights in AS 47.30.725(d) are the respondent's rights, not obligations forced on the respondent. And nothing in the statutory language suggests that the respondent's rights to present evidence and cross-examine witnesses exist only if the respondent is represented by counsel. Subsection (d) instead provides a respondent defense rights which the respondent may choose to exercise through representation by counsel.[22]

Moreover, AS 47.30.725(f) may contemplate an involuntary commitment respondent's self-representation: "A respondent, *if represented by counsel*, may waive,

---

[18]    518 P.2d at 91.

[19]    *Id.* at 1234-35 (quoting CINA Rule 12(c) ("Waiver of Right to Counsel")).

[20]    *Id.*

[21]    *See* AS 47.30.725(d).

[22]    *Id.*

orally or in writing, the 72-hour time limit on the 30-day commitment hearing . . . ."
(Emphasis added.) The phrase "if represented by counsel" further implies that
involuntary commitment respondents, in at least some circumstances, will not be
represented by counsel at all stages of a proceeding and thus will be self-represented.

In a recent unpublished decision, *In re Hospitalization of Brandi A.*, we
recognized that an involuntary commitment respondent represented herself on appeal.[23]
In a sua sponte order prior to appellate oral argument, we remanded the case for the
superior court "to hold a hearing to determine whether [the respondent] wants appointed
counsel to represent her on appeal, and, if not, whether she should be permitted to
represent herself on appeal."[24] We directed the superior court to consider the standards
discussed in *McCracken* and *Barry H.*[25] The superior court held a representation hearing
and determined that the respondent could represent herself, and we allowed her to do so
in the appeal.[26]

Accordingly, we conclude the involuntary commitment statutes reflect that
respondents have the right to self-representation, although that right is not absolute. We
therefore do not reach Arthur's constitutional argument on this issue.

**B.     The *McCracken* Standard In Involuntary Commitment Hearings**

*McCracken* prescribes a three-step inquiry to determine whether a post-
conviction relief petitioner may be self-represented. First, the trial court must "ascertain
whether [the petitioner] is capable of presenting . . . allegations in a rational and coherent

---

[23]     No. S-16750, 2019 WL 324926, at *1 (Alaska Jan. 23, 2019).

[24]     *In re Brandi A.*, No. S-16750 (Alaska Supreme Court Order, June 7, 2018).

[25]     *Id.*

[26]     *In re Brandi A.*, No. S-16750, 2019 WL 324926, at *1; (Alaska Supreme Court Order June 25, 2018).

manner."[27]  Second, the court must "satisfy [itself] that the [petitioner] understands precisely what [the petitioner] is giving up by declining the assistance of counsel."[28] This step requires "demonstrat[ing] that [the petitioner] understands the benefits of counsel and knowingly waives the same"; if the court is not "completely satisfied that the [petitioner] is capable of pro se representation," it is within the court's "sound discretion to insist that the [petitioner] accept consultative assistance by appointed counsel."[29]  Finally, the court must "determine that the [petitioner] is willing to [present evidence and argument] . . . with at least a modicum of courtroom decorum."[30]  We subsequently have concluded that these inquiries must "appear affirmatively on the record,"[31] but a negative finding under any one of the three inquiries is sufficient to justify denying the self-representation request.[32]

The State argues that it would be inefficient and impractical to require a self-representation competency hearing before beginning an involuntary commitment hearing.  But this argument ignores that the two inquiries have different legal standards, requiring two separate determinations.[33]  If at the involuntary commitment hearing the

---

[27]  *McCracken v. State*, 518 P.2d 85, 91 (Alaska 1974).

[28]  *Id.* at 91-92.

[29]  *Id.*

[30]  *Id.* at 92.

[31]  *O'Dell v. Municipality of Anchorage*, 576 P.2d 104, 107-08 (Alaska 1978).

[32]  *Jensen D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 424 P.3d 385, 389 (Alaska 2018).

[33]  *See* AS 47.30.735(c) (providing court must find by clear and convincing evidence that respondent is mentally ill and, as a result, likely to cause harm to self or
(continued...)

-12-                                    **7427**

respondent invokes the right to self-representation, the superior court should dedicate the first part of the hearing to determining the respondent's competency for self-representation under *McCracken*'s framework. Although the court is not necessarily prohibited from reviewing the involuntary commitment petition for this purpose, the court should engage in a thorough colloquy with the respondent before making a determination.[34] The court should ensure that the respondent's waiver of counsel is knowing and intelligent, meaning that the respondent understands the right to counsel, the important advantages of having counsel, and the dangers of declining counsel.[35] A bifurcated process, taking place *before* substantive commitment hearing testimony, may help address the "conceptual difficulty that can arise when a court must consider both whether a respondent is competent to waive counsel and . . . whether the respondent's mental condition necessitates involuntary treatment."[36] A two-fold process would protect

---

[33] (...continued)
others or is gravely disabled before court can order involuntary 30-day commitment); *McCracken*, 518 P.2d at 91-92 (establishing self-representation standard with lower burden of proof).

[34] *See* 53 AM. JUR. 2D *Mentally Impaired Persons* § 35 (2019) (footnotes omitted):

> In a mental health proceeding where the respondent wishes to represent himself, the trial court should engage in a colloquy with the respondent in order to determine whether the waiver of the right to counsel is knowing, intelligent, and voluntary and must ensure that the respondent is advised of the dangers and disadvantages of self-representation.

[35] *See Massey v. State*, 435 P.3d 1007, 1010 (Alaska App. 2018) (explaining court's necessary assurances before finding defendant knowingly and intelligently waived counsel); *see also McCracken*, 518 P.2d at 91-92.

[36] *In re C.S.*, 713 N.W.2d 542, 546 (N.D. 2006) (discussing the "logical
(continued...)

against erroneously presuming incompetence "simply due to the fact that mental health proceedings are being undertaken against the respondent."[37]

The current statutory scheme for involuntary administration of medication provides some guidance. Alaska Statute 47.30.836 recognizes that a respondent who is involuntarily committed retains the right to consent to, or decline, the administration of psychotropic medication. If the treating facility has reason to believe the respondent is incapable of making an informed consent decision, it may file a petition for court-ordered administration of psychotropic medication.[38] The superior court must hold a separate hearing and conduct a separate inquiry into the respondent's capacity to give informed consent.[39] The court also must appoint a "visitor" to assist the court and conduct a capacity assessment.[40] If the court finds the respondent is competent to provide informed consent and the respondent does not consent to receiving psychotropic medication, the court is required by statute to order the facility "to honor the patient's decision about the use of psychotropic medication."[41] The facility may overcome the respondent's decision

---

[36]  (...continued)
tension" between finding of competence to waive counsel and ultimate finding of mental illness); *see also S.Y. v. Eau Claire Cty.*, 469 N.W.2d 836, 842 (Wis. 1991).

[37]  *In re C.S.*, 713 N.W.2d at 546.

[38]  AS 47.30.839.

[39]  *Id.*; *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 241-44 (Alaska 2006).

[40]  AS 47.30.839(d).

[41]  AS 47.30.839(f).

to not receive psychotropic medication only with a court order that includes specific findings.[42]

McCracken sets out the required standard for determining whether a respondent is capable of self-representation, but the superior court may expand its McCracken analysis in the involuntary commitment context by drawing guidance from the foregoing procedure for involuntary administration of psychotropic medication. As the United States Supreme Court has noted: "Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways."[43] And although we recognize the logistical obstacles courts may face when a respondent invokes the right to self-representation, we have faith that the courts are equipped to apply the McCracken analysis in involuntary commitment hearings.

Cases applying the McCracken framework in other contexts also demonstrate that denying a respondent's self-representation request should be based on the superior court's interactions with the respondent, not solely on external sources.[44]

---

[42]     The court first must find the respondent presently is incompetent to provide informed consent and was incompetent at the time of any previously expressed wishes not to be medicated. AS 47.30.839(g). The court then must make an independent judicial determination that administration of psychotropic medication to a non-consenting mentally ill patient in a non-emergency setting is (1) the least intrusive treatment means available, and (2) in the patient's best interests. Id.; Meyers, 138 P.3d at 250, 254.

[43]     Indiana v. Edwards, 554 U.S. 164, 175 (2008).

[44]     See, e.g., Barry H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 404 P.3d 1231, 1235-36 (Alaska 2017) (affirming denial of self-representation request after father behaved inappropriately at earlier hearings, continually challenged court's jurisdiction at termination trial, covertly radio-broadcast confidential

(continued...)

Although medical opinions may clarify the respondent's capacity for self-representation, the court cannot scrupulously apply the *McCracken* factors without engaging directly with the respondent. A court must make a realistic determination about a respondent's mental capacity to participate in a commitment hearing without the aid of counsel, taking into consideration the respondent's age, education, mental condition, the complexity of the proceeding, and the totality of the record before the court.

## C. Denial Of Arthur's Self-representation Request

Arthur argues that the superior court erred by failing to apply the *McCracken* analysis when denying him self-representation. Arthur argues the record shows he "clearly and unequivocally" sought to represent himself, which the State does not dispute. Arthur contends that, once he requested to represent himself, the court was required to ask him questions and advise him before it granted or denied his request, rather than looking only to the State's petition and its direct testimony. Differentiating between what a court must do when *granting* a request for self-representation versus what it must do when *denying* that request, the State responds that the court properly found Arthur failed to meet *McCracken*'s first requirement — being capable of presenting his allegations in a "rational and coherent manner."[45] The State contends that it was not an abuse of discretion to make this finding based on the evidence before the court.

---

**44** (...continued)
proceedings while he was participating telephonically, and argued to such extent that court threatened to disconnect his telephonic participation); *Jensen D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 424 P.3d 385, 389-90 (Alaska 2018) (affirming self-representation request denial when mother interrupted court, interrupted other witnesses' testimony, and appeared under influence of drugs or alcohol).

**45** *See McCracken v. State*, 518 P.2d 85, 91 (Alaska 1974).

The superior court's findings regarding Arthur's capability to represent himself are nearly non-existent. In the hearing's first few minutes, Arthur's attorney informed the court of the self-representation request. The court denied the request immediately, stating: "[B]ased on the petition, the Court would find that the responde[nt] is not fit to represent himself." The court then asked Arthur's attorney if further inquiry was required, and the attorney responded in the negative before Arthur interrupted and asked for a psychiatric evaluation to determine his fitness.[46] The court stated it would "at least hear the [S]tate's direct . . . testimony" before it would "explore further whether or not that is a reasonable possibility." After the psychiatrist's direct testimony, the court summarily stated: "And with the benefit of that direct testimony, the [c]ourt will deny, finally, [Arthur's] application to represent himself . . . ."

Although the superior court apparently considered the request throughout the psychiatrist's direct testimony, relying solely on the petition certainly would have required automatic reversal. Every involuntary commitment petition alleges mental illness; if a court determines self-representation competence based solely on a petition, the self-representation right is nullified and subsumed within the involuntary commitment determination. And despite the court's reliance on the psychiatrist's direct testimony in this case, the court did not wait for cross-examination, engage in any

---

[46] The State contends: "To the extent Arthur now objects to the court's relying on the commitment petition in making its preliminary determination that he was unfit to represent himself, the plain error standard applies because neither [his] attorney nor [he] objected at that time." This statement is incorrect; although Arthur's attorney indicated that no "further inquiry" was required at that point, Arthur immediately interrupted the court to ask for a psychiatric evaluation for the specific purpose of determining his fitness for self-representation, indicating that the petition alone was insufficient. Because of the nature of Arthur's appeal — arguing that he should have been allowed to represent himself — it would be unfair to view his attorney's statement as waiving his representational right, particularly given that Arthur himself objected.

colloquy, or apply any *McCracken* factors before denying Arthur's request to represent himself. Nothing indicates that Arthur was unruly or that he misunderstood the proceedings during the psychiatrist's direct testimony. And the court's findings did not explain why it denied Arthur's request.

The State argues that the superior court implicitly found Arthur did not meet *McCracken*'s first factor — being "capable of presenting his allegations in a rational and coherent manner"[47] — such that the court was not required to do anything more. The State supports its argument by drawing on the psychiatrist's testimony that Arthur was actively manic and experiencing delusions. Although Arthur's mental state certainly was relevant, this is insufficient evidence for concluding he was incapable of "presenting his allegations in a rational and coherent manner."[48] One can be mentally ill and still argue capably. Without factual findings about precisely why Arthur was unfit to represent himself, a finding that he was mentally ill is insufficient to support denying his request to represent himself.

The State supports its argument by stating that Arthur's "testimony further validated the court's decision." But Arthur's testimony was irrelevant; the court already had made its final decision by that point. Even if Arthur's later testimony may have evidenced an inability to present his thoughts rationally and coherently, it was error to not make findings or engage in a discussion with him, as *McCracken* requires, before making that determination.

The State argues that any error in denying Arthur's self-representation request was harmless and that even if the court followed proper procedures, the result would have been the same. But as the United States Supreme Court has held in the

---

[47]  *McCracken*, 518 P.2d at 91.

[48]  *See id.*

-18-                                                                    7427

criminal context: "[T]he right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, [and] its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless."[49] Failure to conduct a self-representation inquiry in this case was more than a mere technical violation. Because a respondent's invocation of the right to self-representation affects the involuntary commitment hearing's framework, failure to conduct a self-representation inquiry after a respondent clearly and unequivocally invokes the right is effectively a structural defect not amenable to harmless error analysis.[50] The 30-day commitment order must be vacated.

## IV.    CONCLUSION

Refusal to hold a separate *McCracken* inquiry on Arthur's self-representation request was legal error requiring that the 30-day involuntary commitment order be VACATED.

---

[49]    *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984).

[50]    *See Massey v. State*, 435 P.3d 1007, 1011 (Alaska App. 2018) (citing *McKaskle*, 465 U.S. at 177 n.8, and holding that "the superior court's refusal to hold a hearing on [the criminal defendant's] request for self-representation was a structural error that requires reversal of his conviction"); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (noting that "structural defects" "defy analysis by 'harmless-error' standards" because they "affec[t] the framework within which the trial proceeds" rather than constituting "simply an error in the trial process itself" (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991))).