*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Protective Proceeding of | ) ) ) Supreme Court No. S-17798 |
| AMY D. | ) Superior Court No. 1JU-10-00300 PR ) ) O P I N I O N ) ) No. 7577 – January 14, 2022 |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances:  Larissa Hail, Assistant Public Advocate, Beth Goldstein, Deputy Director, and James Stinson, Director, Office of Public Advocacy, Anchorage, for Amy D.  No appearance by J.D. (mother).

Before: Winfree, Maassen, Carney, and Borghesan, Justices. [Bolger, Chief Justice, not participating.]

BORGHESAN, Justice.

## I.      INTRODUCTION

A mother no longer wished to serve as her adult daughter's guardian due to fear of her daughter's violence.  The superior court held a hearing to determine whether to allow the mother to resign and appoint a public guardian from the Office of Public Advocacy (OPA) to serve as the daughter's guardian instead.  After a brief exchange, the superior court allowed the daughter to waive her right to counsel and consent to appointment of a public guardian.  We reverse because the superior court did

not sufficiently establish that the waiver of counsel was knowing and voluntary. We remand for further proceedings consistent with this opinion.[1]

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Amy D.[2] is a young woman who has struggled with her mental health since she was a teenager and has been diagnosed with schizoaffective disorder, bipolar type,[3] with a history of polysubstance abuse. Amy has been hospitalized numerous times due to her mental health issues and has had many contacts with law enforcement, particularly after using drugs or alcohol.

In 2011 the superior court appointed Amy's mother as her full guardian with complete discretion to manage Amy's finances, housing, and medical treatment. A report prepared by the court visitor indicated that Amy had recently experienced "an increase in aggressive behavior" and that "her ability to meet all of her needs" was "marginal" without assistance. The visitor added that Amy "has a very supportive family who are very willing to offer help and support as well as housing and as much independence as is possible under the current circumstances." During the initial appointment proceedings, Amy was represented by an attorney from OPA because she

---

[1]     The public guardian shall continue to serve as the ward's full guardian pending resolution of these proceedings on remand.

[2]     We use pseudonyms to protect the parties' privacy.

[3]     A schizoaffective disorder is "an illness manifested by an enduring major depressive, manic, or mixed episode along with delusions, hallucinations, disorganized speech and behavior, and negative symptoms of schizophrenia." *Schizoaffective Disorder*, STEDMAN'S MEDICAL DICTIONARY (2014). Bipolar disorder is "an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes." *Bipolar Disorder*, STEDMAN'S MEDICAL DICTIONARY (2014).

was financially unable to employ an attorney. OPA's representation of Amy terminated on the date of her mother's appointment.

Three years later the court visitor's report described improvement in Amy's mental health. The report observed that although Amy was no longer able to live with her mother because of past violence between them, Amy and her mother had "frequent contact" and "appear to be on much better footing at this point." Amy still needed housing assistance and alternated staying with one of her two sisters. The visitor recommended no changes to the guardianship at that time, and none were made.

In August 2019 the court visitor filed another report showing that Amy's mental health had regressed and her relationship with her mother had deteriorated. Amy had been hospitalized twice in the previous year; the second hospitalization was due to "significant decompensation[,][4] [including] auditory hallucination[,] disorganized behavior, and aggression." The visitor cautioned that although Amy currently had stable housing, without further assistance she was at risk of becoming homeless. Amy was also completely reliant on public assistance, including Supplemental Security Income benefits, Adult Public Assistance, and her yearly Permanent Fund Dividend. The court visitor reported that Amy was unlikely to recover or improve her mental health significantly.

The court visitor recommended to the court that Amy's mother be replaced as Amy's full guardian by an OPA public guardian.[5] According to the visitor, Amy had attacked her mother, chased her from her home, and threatened to kill her. Amy was no

---

[4]    Decompensation is "[t]he appearance or exacerbation of a mental disorder due to a failure of defense mechanisms." *Decompensation*, STEDMAN'S MEDICAL DICTIONARY (2014).

[5]    AS 13.26.710(b) ("A court may order the public guardian to act as full guardian"); AS 13.26.720 (describing "powers and duties of public guardian").

longer allowed in her mother's home, and they only communicated by phone. Due to the decline in their relationship, Amy's mother told the visitor that she could no longer continue as guardian.

## B. Proceedings

In response to the court visitor's report, the superior court scheduled a hearing to review the guardianship in November 2019. Due to a service error, nobody attended this hearing, so the court rescheduled the review hearing for January 2020 and sent notice of the hearing to Amy's mother and the court visitor. OPA was not notified of the hearing.

Present at the hearing were Amy, her mother, and the court visitor. The court indicated that the issue before it was whether a public guardian should be appointed to take over the guardianship from Amy's mother pursuant to the court visitor's recommendation. The court then directly addressed Amy:

> THE COURT: [Amy], the recommendation was made that I substitute the public guardian as your guardian to handle things, to handle your finances and your affairs for you.
>
> You have a right to be represented by a lawyer in this case. The law says that you are entitled to have a lawyer appointed by the court, paid for by the court, to represent you, to give you advice about whether that's a good thing or a bad thing for you, and to advocate for you.
>
> And if . . . you're okay with having the public guardian appointed and you don't feel like you need a lawyer, that's fine, I would go ahead and make that change. But if you want to consult with a lawyer about that, you . . . absolutely have a right to do that and to get some advice about that.
>
> AMY: I think I'm — this is going to be my final decision just to go ahead and agree with what people think about, you know, my guardianship. So —
>
> THE COURT: Okay. You think you're okay with that?

AMY: Yeah.

THE COURT: All right. And, [Amy's mother], let me ask you about that. I mean, are you comfortable with that? Do you think that's the best thing?

AMY'S MOTHER: Of course I have mixed emotions, but —

THE COURT: Sure.

AMY'S MOTHER: Yeah, I think going forward would be — probably be best.

THE COURT: Okay. And do you feel like [Amy] understands that? I mean, her agreeing to that is sufficient? Do you think it would be okay to go ahead without a lawyer or do you think we should get somebody involved to consult with her?

AMY'S MOTHER: I think that's okay. Yeah.

THE COURT: All right. I don't want to make this all legalistic if we don't need to.

AMY'S MOTHER: Yeah. No.

THE COURT: And there's no need to burn state money to hire a lawyer if we don't need to. But I want to make sure we dot the i's and we do this the right way.

[Visitor], are you comfortable with that? With the Court —

COURT VISITOR: Yes, sir.

THE COURT: — simply entering that order, you think that's appropriate?

COURT VISITOR: Yes, sir.

Except for the two responses quoted above, Amy did not speak during the hearing. The court instead spent most of the seven-minute hearing speaking with Amy's mother and the court visitor. The court concluded the hearing by telling the parties that it would issue an order appointing a public guardian as Amy's full guardian.

-5-                                                               **7577**

Four months later, the court issued a written order appointing a public guardian as Amy's full guardian. The order stated that both Amy and her mother "appeared at the hearing, and both were in agreement that OPA should be appointed as guardian." It indicated that a formal guardianship order would follow.

The formal order — issued on a pre-printed court form — made several findings of fact and conclusions of law. First, the court found that "[i]t has been shown by clear and convincing evidence that the respondent is incapacitated" under the definition of incapacity provided in the guardianship statutes. Second, the court appointed a public guardian as Amy's full guardian and conservator, finding that "[t]he respondent is totally without capacity to care for []herself, and a combination of alternatives to guardianship and the appointment of a partial guardian is not feasible or adequate to meet the needs of the respondent." Third, the court found that the public guardian was suitable as Amy's guardian and conservator, because "[n]o person having priority is able to serve." Finally, the court found that it had considered Amy's preference in selecting a guardian and conservator.

OPA requested a motion for entry of final judgment after being notified of its appointment as guardian. Amy filed this appeal shortly thereafter with assistance of counsel from OPA.

### III. DISCUSSION

On appeal Amy argues that the superior court erred by allowing her to proceed without assistance of counsel at a hearing to decide whether to allow her mother to resign as guardian and to appoint a public guardian instead. We conclude that the guardianship statutes afford Amy a right to counsel in this proceeding[6] and that the

---

[6] The superior court acknowledged that Amy had a right to counsel in the proceedings below, and Amy — the only party participating in this appeal — also
(continued...)

superior court did not undertake a sufficient inquiry into whether Amy's waiver of this right was knowing and voluntary. We therefore remand.

## A. A Ward Has A Right To Appointed Counsel When The Superior Court Considers A Guardian's Request To Resign And Have A New Guardian Appointed.

Determining whether Amy had a right to appointed counsel in this guardianship proceeding requires us to interpret the guardianship statutes. The interpretation of a statute is a question of law that we review de novo.[7] "In conducting de novo review, we will 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[8] We use a sliding scale approach to statutory interpretation: "the clearer the statutory language, the more convincing any contrary legislative history must be to overcome the statute's plain meaning."[9] "Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage."[10]

When a person files a petition for appointment of a guardian for an allegedly incapacitated person, the guardianship statutes expressly provide that "[t]he

---

[6]    (...continued)
maintains that she had a right to counsel in the proceedings both as a matter of statute and of due process. Although no one in this proceeding, either in the superior court or on appeal, has disputed Amy's right to counsel, we nevertheless address this threshold issue in her appeal.

[7]    *Se. Alaska Conservation Council, Inc. v. Dep't of Nat. Res.*, 470 P.3d 129, 136 (Alaska 2020).

[8]    *Id.* (quoting *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005)).

[9]    *Id.* at 141.

[10]    AS 01.10.040.

respondent is entitled to be represented by an attorney in the proceedings."[11] "If the respondent is financially unable to employ an attorney, the court shall appoint the office of public advocacy . . . to represent the respondent in the proceedings."[12] This language suggests, but does not expressly state, that the appointment of counsel pertains to "proceedings" on the petition to appoint the guardian and does not normally extend beyond. The court system's form guardianship order reflects this assumption.[13]

The guardianship statutes do not expressly refer to the ward's right to be represented by counsel when the guardian seeks to resign, a process governed by AS 13.26.286.[14] But the legislative intent that the ward have a right to be represented by counsel in this situation is fairly clear in light of the procedures set forth in statute. The legislature established a procedure for a guardian's resignation or removal:

> Before removing a guardian, changing the guardian's responsibilities, *accepting the resignation of a guardian*, or ordering that a ward's guardianship be changed or terminated, the court, *following the same procedures to*

---

[11] AS 13.26.226(b).

[12] *Id*.

[13] Form PG-400 ("Order Appointing Full Guardian With Powers Of Conservator") (9/20) contains a section for the court to indicate when appointment of the respondent's attorney ends. The form contains three options to choose from: (1) the appointment ends on the date the order is signed; (2) the appointment ends 30 days after the guardianship implementation report is filed; or (3) a blank space in which the court can write the date on which the appointment ends.

[14] AS 13.26.286(a) provides that "[o]n petition of the guardian, the court may accept a resignation and make any other order that may be appropriate." Here, Amy's mother did not formally petition to resign. Instead, she made this wish known to the court visitor, who brought the matter to the superior court's attention in the visitor's written report. Notwithstanding the lack of formal petition to resign, this proceeding entails the resignation of a guardian and is therefore governed by AS 13.26.286.

*safeguard the rights of the ward as apply to a petition for appointment of a guardian* and applying the least restrictive alternative necessary to meet the needs of the ward after consideration of alternatives to guardianship services, may send a visitor to the residence of the present guardian and to the place where the ward resides or is detained, to observe conditions and report in writing to the court.[15]

In other words, before accepting the resignation of a guardian, the court must apply the same protective procedures that apply to an initial petition to appoint a guardian. These protective procedures include the appointment of counsel for an indigent person[16] and the court visitor's duty to explain to the respondent the scope of the respondent's right to counsel, including the right to have an attorney designated "to advise and represent the respondent before and at any judicial hearings."[17] This provision reflects a legislative intent that when a guardian seeks to resign, prompting appointment of a new guardian, the ward shall have the assistance of an attorney during the process.

Further indication of legislative intent that a ward shall have the right to counsel in proceedings for the guardian's resignation or removal is found in AS 13.26.296. This statute requires the court to notify a respondent's or ward's attorney of a hearing "[i]n a proceeding for the appointment, change in responsibilities, or removal of a guardian, or termination of guardianship, other than the appointment of a temporary guardian or temporary suspension of a guardian."[18] Although AS 13.26.296 refers only to removal, not resignation, the notice requirement logically applies to the latter as well: Accepting a guardian's resignation necessarily entails the guardian's

---

[15]     AS 13.26.286(c) (emphasis added).

[16]     AS 13.26.226(b).

[17]     AS 13.26.231(a)(3).

[18]     AS 13.26.296(a)(6).

removal (and therefore has the same potential to affect the ward's interests). And the legislature treats resignation and removal of the guardian the same for purposes of the procedural protections described in AS 13.26.286. In light of these provisions it is evident that the legislature intended a ward to have a right to counsel in proceedings on a guardian's petition to resign.[19]

The superior court correctly acknowledged that Amy was entitled to be represented by counsel at the hearing to decide to appoint a public guardian to replace her mother as guardian. We therefore consider whether Amy's waiver of counsel was effective.[20]

## B. Amy's Waiver Of Her Right To Counsel Was Not Effective.

Amy argues that the superior court failed to ensure that her waiver of the right to counsel was "knowing and voluntar[y]." We agree. When a respondent or ward in a guardianship proceeding seeks to waive the right to counsel, the superior court must

---

[19] *See McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 721 (Alaska 2013) ("[W]e must, whenever possible, interpret each part or section of a statute with every other part or section, so as to create a harmonious whole." (quoting *State, Dep't of Com., Cmty., & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007))).

[20] Although Amy's arguments focus on the sufficiency of her waiver, we note another procedural issue with the proceedings below. In light of the analysis above, Amy's counsel was entitled under AS 13.26.296 to notice of the hearing at which her mother's resignation as guardian would be considered. However, there is no indication that Amy had counsel at that time. Although she was represented by OPA in proceedings on the initial petition to appoint a guardian for her in 2011, OPA's representation terminated on the date of the order appointing her guardian: January 17, 2011. Because Amy had a right to be represented by counsel at the January 2020 resignation hearing, it was incumbent on the superior court to determine prior to the resignation hearing whether she was currently represented by counsel so that proper notice could be provided or appointment of counsel at public expense could be considered.

conduct the three-part inquiry described in *McCracken v. State*[21] in deciding whether to accept the waiver. The superior court's brief colloquy with Amy in this case did not satisfy this test.

> **1.      The superior court must apply the three-part inquiry from *McCracken v. State* to determine effective waiver of the right to counsel in guardianship proceedings.**

We recently held in *In re Hospitalization of Arthur A.* that when a respondent in a civil commitment proceeding "clearly and unequivocally invokes the self-representation right, the superior court must hold a preliminary hearing and consider factors we outlined in *McCracken v. State* to determine whether self-representation should be allowed."[22] Although Amy did not invoke her right to represent herself but rather waived her right to counsel at the superior court's suggestion, the concerns are the same: whether the decision to go without counsel is knowing and voluntary. Therefore we conclude that the *McCracken* inquiry applies when considering whether to allow a respondent or ward in guardianship proceedings to waive the right to counsel.

In *In re Arthur A.* a hospital initiated a 30-day involuntary commitment petition against a respondent alleged to be actively psychotic and experiencing delusions.[23] At the commitment hearing, the respondent's attorney informed the court that the respondent wished to represent himself.[24] The court was prepared to find that the respondent was not mentally fit to represent himself based on the petition alone, but

---

[21]      518 P.2d 85 (Alaska 1974).

[22]      457 P.3d 540, 543 (Alaska 2020).

[23]      *Id.* at 544.

[24]      *Id.*

the respondent asked to be evaluated by a psychiatrist first.[25]  After the psychiatrist's testimony, the superior court found that "with the benefit of that direct testimony," it would "deny, finally, [respondent's] application to represent himself."[26]

We reversed because the superior court's inquiry into the respondent's capacity to represent himself was inadequate.[27]  The right to self-representation is important but not absolute, and the court has a duty to "ensure that the respondent's waiver of counsel is knowing and intelligent, meaning that the respondent understands the right to counsel, the important advantages of having counsel, and the dangers of declining counsel."[28]  For that reason, we held that the court should have applied the three-step inquiry from *McCracken v. State* (involving the right of a petitioner for post-conviction relief to represent himself) to assess the respondent's competence to self-represent.[29]

This inquiry requires the court to determine whether the person seeking to self-represent:  (1) is "capable of presenting . . . allegations in a rational and coherent manner"; (2) "understands the benefits of counsel and knowingly waives the same"; and (3) "is willing to [present evidence and argument] . . . with at least a modicum of courtroom decorum."[30]  Findings on "these inquiries must 'appear affirmatively on the record,' but a negative finding under any one of the three inquiries is sufficient to justify

---

[25]  *Id.*

[26]  *Id.* at 545 (quoting superior court).

[27]  *Id.* at 549-50.

[28]  *Id.* at 548.

[29]  *Id.* at 547-49.

[30]  *Id.* at 547.

denying the self-representation request."[31]

Courts must use the same inquiry to evaluate the waiver of the right to counsel in guardianship proceedings. Guardianship and involuntary commitment proceedings are distinguishable in many respects, but their similarities warrant a similar rule for determining when the respondent's (or ward's) waiver is knowing and voluntary.[32] Involuntary commitment and guardianship both entail significant loss of autonomy for the respondent. Although involuntary commitment is a more drastic legal remedy since it results in actual confinement,[33] a guardianship also severely burdens the ward's freedom by allowing another person to manage the ward's affairs.[34] A guardian may be granted authority over significant aspects of the ward's life, such as housing, educational and vocational services, medical and mental health treatment, and the use and disposal of the ward's property, income, and estate.[35] And although involuntary commitment is more limiting, guardianships typically last much longer.[36] For example, Amy's guardianship has lasted more than a decade. By contrast, an involuntary

---

[31] *Id.* (first quoting *O'Dell v. Mun. of Anchorage*, 576 P.2d 104, 107-08 (Alaska 1978); and then citing *Jensen D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 424 P.3d 385, 389 (Alaska 2018)).

[32] *See id.* at 546 (citing *Barry H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 404 P.3d 1231, 1234-35 (Alaska 2017)).

[33] *See* AS 47.30.735(c) ("[T]he court may commit the respondent to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled."); AS 47.30.755(a) (same for 90 days).

[34] AS 13.26.251(c).

[35] *See* AS 13.26.266(b)(1)-(7).

[36] *See* AS 13.26.276(a) (requiring guardians to submit annual reports to the court).

commitment order expires after 30 or 90 days.[37]

In addition, guardianship and involuntary commitment proceedings are both premised on allegations that the respondent's mental capacity is deficient in some respect.[38] Given the nature of these proceedings, it is essential that the court carefully consider a respondent's capacity to self-represent when deciding whether to allow the respondent to exercise that right. Undertaking the inquiry outlined in *McCracken* is therefore required before the respondent or ward may waive the right to counsel in guardianship proceedings.

### 2. The court's brief colloquy with Amy did not satisfy the *McCracken* standard.

As discussed above, the superior court must conduct the three-step *McCracken* inquiry before accepting waiver of the right to counsel in guardianship proceedings. First, the court must determine whether the respondent is capable of presenting allegations in a "rational and coherent manner."[39] Second, the court must "satisfy [itself] that the [respondent] understands precisely what [the respondent] is giving up by declining the assistance of counsel."[40] And third, the court must determine that the respondent is "willing to [present evidence and argument] . . . with at least a

---

[37]    AS 47.30.735(c); AS 47.30.755(a).

[38]    AS 47.30.730(a) (providing that petition for civil commitment must allege respondent is "mentally ill and as a result is likely to cause harm to self or others or is gravely disabled"); AS 13.26.221(b) (providing that petition for guardianship of incapacitated person must allege "the nature and degree of the alleged incapacity").

[39]    *In re Hospitalization of Arthur A.*, 457 P.3d 540, 547 (Alaska 2020) (quoting *McCracken v. State*, 518 P.2d 85, 91 (Alaska 1974)).

[40]    *Id.* (quoting *McCracken*, 518 P.2d at 91-92).

modicum of courtroom decorum."[41] Failure to make the findings or engage in the colloquy required by *McCracken* amounts to legal error.[42]

The superior court's brief colloquy with Amy does not satisfy this standard. With regard to the first and third inquiries, the court only asked Amy two questions to which she gave two short responses, one of which was interrupted. This brief exchange does not establish that Amy was "capable of presenting [her] arguments in a rational and coherent manner" or with "a modicum of courtroom decorum."[43]

Nor does the record establish that Amy understood the benefit of counsel and what she was giving up by waiving her right. The superior court asked whether Amy waived her right to counsel and consented to the change in guardianship simultaneously in the same sentence. In reply, Amy gave a non-responsive answer to this two-part question stating that she believed that her "final decision" was that she wished to just "go ahead and agree with what people think about . . . [her] guardianship." Instead of stopping to clarify whether Amy understood the significance of each distinct question, the court stated, "You think you're okay with that?" to which Amy responded, "Yeah."

Amy's non-responsive answer followed by her one-word affirmation to the court's two-part question does not show that she appreciated that she was agreeing to two very different things: waiving her right to counsel and consenting to the new guardianship. It seems especially critical for the court to ensure that Amy appreciated this distinction, since the court had previously found her to have an impaired "ability to

---

[41]     *Id.* (quoting *McCracken*, 518 P.2d at 92).

[42]     *See id.* at 550 ("[I]t was error to not make findings or engage in a discussion with him, as *McCracken* requires, before making that determination.").

[43]     *See id.* at 547, 550 (quoting *McCracken*, 518 P.2d at 91-92).

receive and evaluate information."[44] Although this prior finding of incapacity does not allow the superior court to presume incapacity in this instance,[45] it requires the superior court to take special care to ensure that waiver of counsel is knowing and voluntary.

Because the superior court failed to have the discussion and make the findings required to ensure that Amy's waiver of counsel was knowing and voluntary, its decision to allow her to waive that right was legal error. This error requires reversal. We need not decide whether the erroneous waiver of Amy's statutory right to counsel is a structural error requiring automatic reversal as in *In re Arthur A.*[46] or is subject to harmless error analysis[47] because we cannot conclude that the error was harmless. The record suggests that Amy had other family members living in the same community. An attorney may have helped Amy identify one of these family members, or another person, to serve as Amy's guardian, obviating the need to appoint a public guardian. We therefore remand for further proceedings.[48]

## IV.    CONCLUSION

We REVERSE and REMAND the superior court's decision to allow Amy

---

[44]    *See* AS 13.26.005(5).

[45]    AS 13.26.201.

[46]    457 P.3d at 550 ("[T]he right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, [and] its denial is not amenable to 'harmless error' analysis." (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984))).

[47]    *Cf. In re Hospitalization of Rabi R.*, 468 P.3d 721, 732-33 (Alaska 2020) (holding superior court's consideration of unsworn allegations when issuing civil commitment order was harmless error).

[48]    Because we remand this matter for further proceedings, we do not address OPA's argument that the public guardian was entitled to notice of the hearing to decide whether to appoint it as Amy's guardian in lieu of her mother.

to waive her right to counsel, with instructions to promptly hold another hearing for which Amy is appointed counsel. At this hearing, Amy may again choose to exercise her right to represent herself, and the court may allow her to exercise that right in a manner consistent with this opinion. The public guardian will remain Amy's full guardian pending resolution of the proceedings on remand.